# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       *Plaintiff,*

vs.

       Case No.10-10060-01,02,03,04-EFM

ADIS POGHOSYAN,
VACHAGAN BAGHDASARYAN,
HAYKAZ MANSURYAN, and
ARTOUR HAKOBYAN,

       *Defendants.*

## MEMORANDUM AND ORDER

Presently before the Court is Defendant Vachagan Baghdasaryan's Motion to Suppress California Evidence (Doc. 129),[1] Defendant Haykaz Mansuryan's Motion to Suppress Evidence (Doc. 110), Defendant Artour Hakobyan's Motion to Suppress Evidence (Doc. 114), Defendant Adis Poghosyan's Motion to Suppress Evidence (Doc. 117), and Defendant Vachagan Baghdasaryan's Motion to Suppress Evidence (Doc. 121), and the Government's Daubert Motion, which it made in open court. The Court held a hearing on these motions on October 12-14, 2010. For the reasons stated below, the Court denies the motions.

---

[1]Defendants Haykaz Mansuryan and Adis Poghosyan joined in this motion. *See* Doc. 124 (Mansuryan's motion for joinder); Doc. 119 (Poghosyan's motion for joinder).

# BACKGROUND

## California Searches

Shortly after midnight on March 24, 2010, in Glendale, California, Police Officer Warren Holmes, an eighteen year veteran of the force, observed a black Mercedes exit the Sakura Motel parking lot and pull on to the westbound lane of Colorado Street. Officer Holmes noticed that the vehicle did not have a license plate and that the vehicle's windows had a very dark tint. Believing that the vehicle's current condition violated California law, Officer Holmes pulled it over. After effectuating the stop, Officer Holmes asked the vehicle's sole occupant, Haykaz Mansuryan, for his license and the vehicle's registration. Mansuryan produced his license, but not the registration. Once Mansuryan had produced his license, Officer Holmes began asking him who owned the vehicle he was driving. At first, Mansuryan responded simply by repeating Holmes' question. Eventually, however, Mansuryan stated that the car belonged to his friend's uncle, "Allen." Mansuryan offered no further details about the car's owner or how he came to possess it.

At some point, Officer Holmes radioed for backup, and asked Mansuryan to step out of the car. Once backup arrived, Officer Holmes began searching the vehicle. He started his search in the interior of the vehicle and then moved to the trunk, which is where Mansuryan had told Holmes that the vehicle's license plate would be. The license plate was not immediately visible in the trunk, so Holmes opened a box that was sitting therein. In this box, Holmes discovered a green dot Visa card, which later testing revealed was re-encoded, and what he perceived to be a reader/writer. While Officer Holmes was performing his search, he heard Mansuryan tell one of the backup officers that the car belonged to a man named David.

After finding the card reader, Officer Holmes arrested Mansuryan. At the time of the arrest, Holmes removed a Sakura Motel room key and a shipment receipt from Mansuryan's person. The receipt indicated that Adis Poghosyan had shipped a package, which weighed fifty-three pounds and was purportedly carrying pharmacy goods, from a UPS store in Tampa, Florida, to Vachagan Baghdasaryan's home in Los Angeles, California.

Sometime during the traffic stop, Officer Holmes informed Officer Camille Sobolewski, a five-year veteran of the force who had spent time in the Financial Crimes Bureau, that he had observed the vehicle leaving the Sakura Motel. He also told Officer Sobolewski what evidence he had discovered in the vehicle and on Mansuryan's person. Additionally, Officer Holmes provided Officer Sobolewski with a list of names that he compiled sometime during the stop. Based on this information and his experience as a law enforcement agent, Officer Sobolewski believed that there could be further evidence of credit card fraud at the Sakura Motel. Acting on this belief, Officer Sobolewski and his sergeant went to the Sakura Motel. Once they arrived, the officers made their way to the Motel's front desk. As they were walking, the officers noticed Artour Hakobyan leaving the last room on the south side of the Motel, room 106. After reaching the front desk, the officers asked the Motel's manager whether anyone with a name matching one of those stated on the list provided by Officer Holmes was renting a room. The manager said that there was and indicated that the individual was staying in room 106.[2]

As the officers made their way to room 106, they encountered Hakobyan. The officers asked Mr. Hakobyan if he was staying in room 106; Mr. Hakoyban stated that he was. The officers asked him to accompany them to the room. Once the officers reached room 106, they knocked on the door.

---

[2]On direct examination, Officer Sobolewski stated that he believed that the manager told him that Adis Poghosyan was renting room 106. However, on cross, Officer Sobolewski testified that he could not remember who the manager said was renting the room.

Adis Poghosyan answered. As Poghosyan was opening the door, Officer Sobolewski could see another individual, Melqon Epremyan,[3] come out of what appeared to be a backroom and walk up behind Poghosyan. Not knowing if either Poghosyan or Epremyan were armed or whether there were additional individuals in the backroom, Officer Sobolewski asked the occupants to please step outside, which they did. After the occupants were out, one of the officers asked Poghosyan if the room was registered under his name. Poghosyan responded by saying no and that the room was registered under the name of Haykaz. The officers then asked Poghosyan if he was staying in the room. Poghosyan stated that he was. Eventually, the officers asked Poghosyan if they could look in the room real quick. Poghosyan said that they could.[4] Once inside, Officer Sobolewski noticed, in plain sight, an embossing machine in the bathtub with a brown box sitting next to it. After completing this cursory sweep, Officer Sobolewski told his sergeant what he had found. Officer Sobolewski's sergeant took a quick gander at the machine and then froze the room. Neither Officer Sobolewski nor his sergeant removed any evidence from the room.

Detective Magtoto and Detective Suttles of the Glendale Police Department were called to the Sakura Motel. Once they arrived, Detective Magtoto spoke with Officer Holmes, who informed Magtoto of what he had discovered from the car stop. Magtoto also spoke with Officer Sobolewski, who told him what he had found in the Motel room. Detective Magtoto, accompanied by Detective Suttles and without a warrant or the consent of room 106's occupants, entered room 106 where he discovered an embosser, a heat-sealing machine, and two brown boxes. Sometime after this search, officers reviewed the Motel's surveillance videos, which revealed that Mr. Mansuryan and Mr. Baghdasaryan had checked into the Motel together and that Mr. Baghdasaryan had carried two

---

[3]Epremyan is not a defendant in this case.

[4]The parties produced the audio recordings from this encounter, which the Court reviewed.

brown boxes into room 106.

Based on what he had learned and discovered at the Sakura Motel, Detective Magtoto prepared a sworn affidavit in support of a search warrant. In this affidavit, Magtoto listed his expertise and the facts that he believed established probable cause to search room 106 and the homes of both Mansuryan and Bagdasaryan. Specifically, Magtoto stated: (1) that Officer Holmes had pulled over Defendant Mansuryan shortly after Mansuryan was seen leaving the Sakura Motel; (2) that Officer Holmes had discovered a card reader/writer and a re-encoded card in the vehicle driven by Defendant Mansuryan; (3) that the clerk at the Sakura Motel had told officers that room 106 had been rented by Mansuryan; (4) that Officer Sobolewski had discovered what he believed, based on his training and expertise, to be an embossing machine in the bathroom in room 106; (5) upon arriving at the scene that he had corroborated Officer Sobolewski's sighting of an embosser; (6) that he had discovered a heat sealing machine next to the embosser; (7) that he had discovered two brown boxes near the bed, which appeared to fit hand and glove with the machinery and resembled the two boxes that the Sakura Motel's surveillance videos showed Baghdasaryan carrying into the room; (8) that a shipping receipt, showing that Adis Poghosyan, an occupant of room 106, had shipped a package containing pharmacy machinery and weighing in excess of 53 pounds from Tampa, Florida, to Vachagan Baghdasaryan's home in Los Angeles, California, was recovered from Mansuryan's front pant pocket during the traffic stop; (9) that Poghosyan told Detective Suttles that the package contained personal effects; (10) that the Motel's surveillance videos showed Mansuryan and Baghdasaryan arriving at the Motel together and Baghdasaryan carrying two boxes into the room; and (11) that, based on the experience he has gained from being a police officer for the City of Glendale since December of 1997 and from being assigned to the Financial Crimes Unit since

March of 2007, people who acquire or possess counterfeit items keep them on their person, their vehicles, and their residence. A search warrant was issued enabling Detective Magtoto to search room 106 and both Mansuryan's and Baghdasaryan's homes.

**I-70 Stops**

On the evening of March 30, 2010, Canine Officer Tim Comroe of the Eagle County, Colorado Sheriff's Office and his canine, Tucker, were called out to perform a dog sniff on a black Mercedes, which had been stopped while driving on I-70 and which contained some of the defendants in this case. Tucker did not indicate on the vehicle, and the vehicle's occupants were allowed to continue on their journey.

On the morning of April 2, 2010, while traveling westbound on I-70 in a marked car, Kansas Highway Patrol Trooper Steven Harvey, a trooper with over twenty-one years of experience, observed two Mercedes – one pearl in color and the other black – traveling in excess of ninety mile per hour in the eastbound lane of I-70. Both vehicles were in the passing lane, with the pearl-colored vehicle leading the black one. According to Trooper Harvey, there was only about a one-second gap between the two vehicles. Trooper Harvey immediately turned his car around and started pursing the vehicles. He did not turn on his emergency lights.

Once he had caught up the vehicles, Trooper Harvey drove beside the rear vehicle, the black Mercedes, so that he could take a look at its occupants. However, because the vehicles were fastly approaching a semi, Trooper Harvey had to slow down and fall in behind the vehicle. According to Trooper, once he got behind the black Mercedes, it abruptly slowed down, which had the effect of boxing him in. Sometime while this going on, Trooper Harvey ran the tags of the black Mercedes

and requested backup. Master Trooper William Poland, a trooper with over twenty years of experience, heard Harvey's traffic about getting boxed in and responded.

After clearing the semi, Trooper Harvey sped up to catch the pearl-colored Mercedes. As he was approaching the pearl Mercedes, traveling at a speed of seventy-three miles-per-hour, Trooper Harvey noticed something that he thought was abnormal: the black Mercedes had sped up and had started getting close to him. Trooper Harvey interpreted this action as an attempt by the driver of the black Mercedes to threaten him. At some point, Trooper Harvey also ran the pearl-colored Mercedes' tags. Dispatch informed him that both of the vehicles belonged to Hertz of Los Angeles, California.

Eventually, Trooper Poland arrived on the scene. Trooper Poland pulled up behind the black Mercedes and turned on his flashers. Trooper Harvey, behind the pearl Mercedes, did the same. The pearl Mercedes was pulled over near milepost 143 and the black Mercedes was pulled over approximately a mile behind the pearl one.

Trooper Harvey asked the driver of the pearl Mercedes, Adis Poghosyan, for his license and registration. As Poghosyan was looking for his license, Trooper Harvey noticed that he had a second ID in his wallet and that his hands were shaking. Poghosyan eventually produced his license. In addition, he also produced the car's rental agreement, which stated that the car had been rented out to another person, Haykaz Mansuryan, the driver of the black Mercedes, on March 30 and was to be returned by April 4. Trooper Harvey testified that third-party rentals are not something that he encounters very often, and, when he does, it is usually in cases involving drugs or some other criminal activity. During his exchange with Poghosyan, Trooper Harvey noted that the passenger, Vachagan Baghdasaryan, never made eye contact with him. Based on all the events related to the

stop, Trooper Harvey testified he believed that this stop might result in his first gun fight. Accordingly, he requested Trooper McCord join him on this stop.

Following his conversation with Poghosyan, Harvey asked Baghdasaryan for his ID, which Baghdasaryan failed to produce. Baghdasaryan did provide Harvey with his identification information. However, he did so in a manner that Trooper Harvey believed was very odd. First, Baghdasaryan spelled out his name phonetically. Second, he offered his driver's license number verbally.

After receiving the pearl Mercedes' occupants' information, Trooper Harvey ran the information. He also asked dispatch to perform a Triple-I check for each of the occupants. Trooper McCord joined Harvey in his car. While both troopers were in the car, they noticed what Trooper Harvey classified as "I'm so nervous, what are they going to do, they got me here" behavior. As Harvey was writing the ticket, Trooper McCord got out of the car, approached the pearl Mercedes, and asked its occupants where they were headed. The occupants stated that they were headed to John Wayne's bachelor party in Chicago. Eventually, dispatch reported that the Tripe-I check revealed that both occupants had criminal histories.

After handing the driver the tickets, Harvey started back to his car. Before reaching his car, though, Harvey decided to ask the occupants a few more questions. The occupants answered most of his questions. However, they declined Harvey's request to search the vehicle. Trooper Harvey then requested a drug dog at approximately 10:02 a.m. According to Harvey, some time before the dog was requested, he had spoke with Trooper Poland and they had discussed the stories that each cars' occupants had given them.

While Trooper Harvey was effectuating the stop of the pearl Mercedes, Trooper Poland was effectuating the stop of the black Mercedes. Trooper Poland made contact with its driver, Haykaz Mansuryan, and passenger, Artour Hakobyan, and asked the occupants where they were from and where they were headed. Both responded by stating that they were headed to Chicago to attend a bachelor party for a man named John, a man that neither of them knew. The occupants did not know when the party was to be held or when they were going to return. Trooper Poland also learned from the Triple I check that the driver had an arrest record and that the passenger had a narcotics arrest.[5] However, when Trooper Poland asked the driver if he had ever been arrested, the driver denied that he had.

Trooper Poland issued the driver of the black Mercedes a citation for speeding and following the pearl Mercedes vehicle too close. Trooper Poland asked the driver if he minded answering a few questions. The driver stated that he did not. However, when Trooper Poland requested to search the car, he denied the trooper his request. Following this denial, Trooper Poland decided to call for a drug dog unit. According to Trooper Poland, he made this decision independent of any decision made by Trooper Harvey and without speaking to Harvey. On the stand, Trooper Poland stated that he later learned that Trooper Harvey had requested the drug dog unit before he did.

Because the closest drug dog unit was over eighty miles away, it wasn't until 10:55 a.m. that the narcotics detecting canine, PSD Justice, and his handler, Trooper Andrew Schippers, arrived on scene. Trooper Schippers stopped at the black Mercedes first. When Trooper Schippers arrived, he

---

[5]The record reveals that the passenger had not actually been arrested for narcotics; rather, his arrest stemmed from a threat he had made. However, it is uncontroverted that at the time that Trooper Poland made the decision to call for a drug dog he believed that the passenger had a narcotics arrest.

opened the passenger side door, stepped inside, and rolled up the window.[6]  After retrieving PSD

Justice, Trooper Schippers gave the canine the find command,[7] and started walking around the

vehicle in a counter-clock-wise motion.   Normally, PSD Justice follows him as he does this.

However, this time, PSD Justice broke from Schippers' lead and went around the vehicle in a clock-

wise motion.   He came back around and met Schippers on the passenger side of the vehicle.   PSD

Justice then started following the trooper.   When the two got by the driver's side front door,

Schippers noticed that PSD Justice started sniffing "real intense", which, based on his experience,

indicated to Schippers that PSD Justice was alerting to a drug odor.   Shortly after he began his

intense sniffing, PSD Justice jumped up on the driver's side front door.   The two continued around

the vehicle.   When they got to the passenger's side door, PSD Justice again jumped up on the door.

Finally, on the last pass around the car, PSD Justice jumped up the driver's side door and began

scratching, which is the prescribed behavior for indicating the presence of narcotics.   Based on PSD

Justice's indication, Troopers Schippers and Poland searched the black Mercedes' passengers

compartment, while another trooper stood outside with the occupants.   No narcotics were found.

The troopers then searched the vehicle's trunk, which resulted in the discover of an encoding device,

but again no narcotics.

        After helping with the search of the black Mercedes, Trooper Schippers drove to the pearl

Mercedes.   Trooper Harvey ordered Poghosyan and Baghdasaryan out of the vehicle.   As Poghosyan

was getting out of the car, on his own and without any prompting from Trooper Harvey, he rolled

down the vehicle's front windows.   Trooper Schippers brought PSD Justice up to the vehicle's

---

[6]At the hearing, Schippers gave conflicting testimony about what he did once he was in the vehicle.  On direct, he stated that he merely turned off the car.  However, on cross, after he had been shown the visual recording of the stop, which revealed that Schippers had rolled up its windows, he admitted that he obviously had done so.  He also admitted that it is his understanding that he cannot enter a vehicle without probable cause.

[7]PSD Justice was not on a leash.

passenger's side rear corner and gave the find command.[8]  The trooper and his canine then made their way around the vehicle.  When they got to the driver's side front door, PSD Justice broke from his sniff pattern and put his head through the open window.  He then jumped into the vehicle and made his way to the back seat, where he started scratching on a jacket.  Based on the dog's indication, Trooper Schippers and Trooper McCord performed a search of the vehicle.  No narcotics were discovered.  However, approximately 247 credit cards, which bore names different than the defendants', were found underneath the backseat of the vehicle, and a computer was found in the trunk.  The troopers detained the occupants of both the pearl and black Mercedes, and the vehicles they were driving were impounded.  Trooper Harvey performed an inventory search, which revealed a marijuana gleaning underneath the passenger's seat of the pearl Mercedes.

**Trooper Schippers' and PSD Justice's Training**

Trooper Schippers and PSD Justice went through seven weeks of training to become a certified narcotic dog detection team, and passed their certification test.  Schippers and PSD Justice both received the letter grade B, which means that they had performed at a commendable level.  During the testing, PSD Justice had zero misses and no false indications.

Following their certification, Trooper Schippers and PSD Justice engaged in maintenance training.  During each of these training sessions, PSD Justice had a one-hundred percent accuracy rate.

On April 5, 2010, three days after the stop in question occurred, Trooper Schippers and PSD Justice participated in training activities.  Once again, PSD Justice had a one-hundred percent accuracy rate while participating in these activities.

---

[8]PSD Justice was not on a leash.

# ANALYSIS

**Government's Oral Motion to Exclude the Defendants' Expert Witness**

At the hearing, the defendants called Steven Nicely, owner of Canine Consultants of America, to testify as an expert on the subject of canine sniffs. Mr. Nicely professionally trained both canines and their handlers from 1989 to 2006. Nicely estimates that during that time he trained around 750 dogs and 400 handlers. In preparing to testify, Mr. Nicely reviewed Trooper Schippers' and PSD Justice's training reports and the visual recordings of the two sniffs. He also listened to the testimony provided by the other witnesses during the hearing.

While on the stand, Mr. Nicely offered a number of opinions. The first was that PSD Justice is not a well-trained canine. The second was that the Kansas Highway Patrol should use double-blinded testing (neither the handler nor judge know where the narcotics are hid), as opposed to single-blinded testing (the handler does not know whether the narcotics are hid, but the judge does), because judges may subconsciously cue the handler and/or his canine. The third was that Trooper Schippers should not have gotten into the black Mercedes because it could cause PSD Justice to show an interest in the car even though no narcotic odor was emanating from it. The fourth was that if there was actually a narcotic odor coming from the black Mercedes' driver's side door, PSD Justice should not have left it after he initially jumped up on the window. The fifth was that, due to the breeze that day,[9] there was no way that an odor was coming out of the driver's side door of either of the vehicles. The sixth was that Trooper Schippers subconsciously cued PSD Justice during the sniffs. In addition to offering these opinions, Nicely also presented a video that contained five sniffs that were performed by canines he considered to be well trained.

---

[9] All agreed the day of the traffic stop was very breezy, with wind out of the Northwest.

At two different times during the hearing, the Government objected to Mr. Nicely being able to testify as an expert. The first objection came shortly after Mr. Nicely began testifying. The Government premised this objection on its belief that Mr. Nicely was not qualified to give expert testimony. The Court reserved its ruling on this objection. The second was made after Mr. Nicely had finished testifying. At that time, the Government argued that Mr. Nicely's testimony, namely the portion relating to whether PSD Justice was a well-trained dog, was unsupported speculation. The Government asked that the Court strike all of Mr. Nicely's testimony and have Mr. Nicely repay the money he had been paid. Once again, the Court reserved its ruling.

Opinions based on scientific, technical, or specialized knowledge are governed by Rule 702. Rule 702 provides that a witness who is qualified by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise as to scientific, technical, or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if, (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[10] A district court has broad discretion in deciding whether to admit expert testimony.[11]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[12] To determine whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court must determine "if the expert's proffered testimony . . . has 'a reliable

---

[10]Fed. R. Evid. 702.

[11]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citing *Orth v. Emerson Elec. Co., White-Rodgers Div.*, 980 F.2d 632, 637 (10th Cir. 1992)).

[12]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

basis in the knowledge and experience of his discipline.' ”[13]  The Court must then inquire into whether the proposed testimony is sufficiently “relevant to the task at hand.”[14]  An expert opinion “must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required.”[15]

> The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is “generally accepted” in the scientific community.  Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability.[16]

In *Daubert v. Merrell Dow Pharmaceuticals*[17], the Supreme Court set forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[18]  In some cases, though, these factors may not be pertinent.  For example, when an expert's testimony is based on personal experience and expertise, the *Daubert* factors have little utility.[19]

After reviewing Mr. Nicely's testimony and considering the arguments of counsel, the Court concludes that Mr. Nicely's testimony should not be stricken on *Daubert* grounds.  Although Mr. Nicely lacks an advanced degree, he does have extensive experience in both training and handling

---

[13]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[14]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[15]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[16]*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004).

[17]509 U.S. 579.

[18]*Daubert*, 509 U.S. at 593-94.

[19]*See Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304-05 (D. Kan. 2008).

canines.[20]  Mr. Nicely's opinions are derived from his experience and knowledge, which both this

Court and the Tenth Circuit have held is a reliable methodology.[21]  Accordingly, the Court denies

the Government's oral motion.[22]

Although Nicely's testimony does survive a *Daubert* challenge, it has no affect on the

Court's resolution of the matters now before it, as the Court does not find Mr. Nicely's testimony

credible.  A number of Mr. Nicely's opinions are not tailored to the specific facts of this case.  For

example, Mr. Nicely testified that Trooper Schippers should not have gotten into the car, however,

he failed to describe what, if any, effect this action had on PSD Justice.  He also failed to describe

how the Kansas Highway Patrol's use of single-blinded testing affected either PSD Justice's or

Trooper Schippers' training.  Furthermore, many of the problems that Mr. Nicely highlighted with

regards to the two sniffs in question, *e.g.,* the canine going past a particular area and then coming

back and indicating on it, and the handler impeding the canine's progress around the vehicle, are

also present in many of the sniffs contained in the video that he represented as showing examples

of good sniffs and well-trained canines.  Lastly, there is no evidence showing that PSD Justice was

cued at anytime during his training, which is particularly damning, because, as stated by Lieutenant

Moomau, a handler would have to have cued their canine in training in order for cueing to be

successful in the field.  Therefore, in light of these facts, and others, the Courts finds Mr. Nicely's

expert testimony to be uncredible, and, thus, disregards it.

---

[20]*See United States v. Beltran-Palafox*, 2010 WL 2287484, at *8 (D. Kan. June 3, 2010).

[21]*Id.* at *10; *Bitler*, 400 F.3d at 1235.

[22]The Court also denies the Government's informal request to have Mr. Nicely repay the money he had been paid.

**Motion to Suppress California Evidence (Doc. 129)**

In his motion, Defendant Vachagan Baghdasaryan argues that all of the evidence seized in California should be suppressed because it was obtained in violation of his Fourth Amendment rights. As argued by the Government, though, before the Court may evaluate a defendant's suppression argument, the defendant must first show that he has standing to challenge the search or seizure in question.[23] If a defendant fails to show "by a preponderance of the evidence that [he] was personally aggrieved by the alleged search and seizure because it invaded [his] subjective expectation of privacy which society is prepared to recognized as reasonable," the Court need not determine whether an officer's conduct violated the Fourth Amendment.[24]

Defendants have challenged three California searches: (1) the traffic stop that occurred on Colorado Street; (2) the searches at the Sakura Motel; and (3) the search of Defendant Baghdasaryan's home.[25]

As to the traffic stop, the Court finds that all of the defendants lack standing to challenge it. To have standing, a defendant must do more than simply show that he was present in the car or possessed the vehicle's keys;[26] he "must establish a link between himself and the registered owner."[27] To determine whether the necessary link has been established, the Court considers the following three criteria: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he

---

[23]*See, e.g., United States v. Cantley*, 130 F.3d 1371, 1377 (10th Cir. 1997).

[24]*Id.* (quoting *United States v. Carr*, 939 F.2d 1442, 1444 (10th Cir. 1991)) (alteration in original).

[25]During the hearing, the Government stated that it was not going to produce any evidence that was seized from Mansuryan's home at trial.

[26]*United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

[27]*United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009).

had a legitimate possessory interest in the vehicle."[28]  Here, none of the defendants have presented

any evidence with regards to any of three aforementioned criteria.  In fact, outside of Officer

Holmes' testimony that Defendant Mansaryan told him that the black Mercedes was owned by

"Allen," there is no evidence that any of the defendants even knew who owned the vehicle.  As a

result, the Court finds that Officer Holmes' stop of the black Mercedes may not be challenged by

these defendants.

      With regards to the searches of the Sakura Motel, the Court finds that Defendants Poghosyan

and Mansuryan have standing to claim a Fourth Amendment violation, as the Government has

conceded that they do.[29]  However, ironically, the party that filed the motion, Vachagan

Baghdasaryan, does not.  "Overnight guests and joint occupants of motel rooms possess reasonable

expectations of privacy in the property on which they are staying."[30]  In this case, there is no

evidence that Mr. Baghdasaryan was an overnight guest or an occupant of room 106.  Furthermore,

there is no evidence that room 106 was rented under Baghdasaryn's name or that Baghdasaryn was

present at the time the room was searched.  Therefore, in light of these facts, Baghdasaryn lacks

standing to assert a Fourth Amendment violation.[31]

      As for the search of Baghdasaryan's home, the Government concedes that Baghdasaryan has

standing.  Therefore, Baghdasaryan can raise a claim that his Fourth Amendment rights were

violated by the search.  The other defendants, though, cannot.  In order for a nonresident to possess

---

[28]*Id.* at 1274-75.

[29]*See, e.g., United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) ("When the Government conceded each defendant's 'standing' to challenge one or more specified searches, it relieved each defendant of his burden of demonstrating a legitimate expectation of privacy with respect to those specified searches."); *United States v. Dewitt*, 946 F.2d 1497, 1499-1500 (10th Cir. 1991) (stating that the issue of Fourth Amendment standing could be waived if the government has 'failed to raise [it] in a timely fashion during the litigation' " (quoting *Steagald v. United States*, 451 U.S. 204, 209 (1981)) (alterations in original)).

[30]*United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004).

[31]*See United States v. Cook*, 344 Fed. Appx. 473, 476 (10th Cir. 2009).

a right to privacy in a residence, they must be either an overnight guest or a social guest at the time of the illegal search.[32] Here, there is no evidence that Defendants Mansuryan or Poghosyan were overnight or social guests at Baghdasaryan's home at the time that the search took place. Accordingly, they lack standing to challenge the search of Baghdasaryn's home.

In sum, the Court finds that Defendants Poghosyan and Mansuryan have standing to challenge the searches of room 106 at the Sakura Motel, but not the search of Baghdasaryan's home. Defendant Baghdasaryan has standing to challenge the search of his home, but not the searches of room 106 at the Sakura Motel. None of the defendants have standing to challenge the traffic stop and search. With this established, the Court will now turn to the issue of whether the searches at the Sakura Motel and the search at Baghdasaryan's home violated the Fourth Amendment.

### *Searches at the Sakura Motel*

It is well established that the many of the protections afforded by the Fourth Amendment to homes and offices apply equally to hotel rooms.[33] It appears that the defendants believe that officials from the Glendale Police Department performed three illegal searches on room 106 at the Sakura Motel: the first being when Officer Sobowlewski entered the room to perform a protective sweep; the second being when Detective Magtoto entered the room to corroborate Sobowlewski's initial plain view sighting; and the third being when the room was searched pursuant to a search warrant.

The Government argues that Officer Sobowlewski's search can be justified on two grounds. The first is that Sobowlewski entered the room to perform a protective sweep. The second is that Poghosyan gave Sobowlewski consent to search the room. The Government's first argument is

---

[32]*See United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009); *see also United States v. Ridley*, 639 F. Supp. 2d 1235, 1238 (D. Kan. 2009) (finding that the defendant had not demonstrated a reasonable privacy interest in the house searched because he was not present at the time of the search, did not claim a possessory interest in the house, was an infrequent social guest at the house, and did not have social guest status at the time of the search).

[33]*Hoffa v. United States*, 385 U.S. 293, 301 (1966).

without merit.   The Tenth Circuit has stated that "[a] protective sweep based solely on the safety of law enforcement officers may be conducted '*only incident to an arrest*.' "[34] Here, at the time that the sweep was performed, none of room 106's occupants had been arrested.   Therefore, Sobowlewski's entrance cannot be justified on the ground that it was a protective sweep.

Searches made pursuant to consent are valid if the following elements are met: (1) the person who gave the officer consent to search had authority to do so; (2) the consent was voluntary; and (3) the search did not exceed the scope of consent.[35]  The Government has the burden of showing that a valid consent was given.[36]

In cases involving a third-party consent, which is the case here,[37] the Government must show that the third party had actual or apparent authority to do so.[38]  "A third party has actual authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."[39]  Apparent authority exists when "the facts available to the officer at the moment warrant a man of reasonable caution to believe that the consenting authority had authority of the premises."[40]  "Where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent."[41] When making its determination of whether a party had authority to consent to a search,

---

[34]*United States v. Porter*, 594 F.3d 1251, 1256 (10th Cir. 2010) (citing *United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007)) (emphasis added).

[35]*See United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230-31 (10th Cir. 1998).

[36]*See, e.g., United States v. Cos*, 498 F.3d 1115, 1124 (10th Cir. 2007).

[37]*See Kimoana*, 383 F.3d at 1221 (classifying, implicitly, the person who consented to a search, but was not the registered renter of the motel room, as a third party).

[38]*United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010); *cf. Cos*, 498 F.3d at 1124 (stating that "[t]he government has the burden of proving that the consenting party had such authority").

[39]*Id.* (alterations in original omitted).

[40]*Cos*, 498 F.3d at 1128 (quoting *Illinois v. Rodriquez*, 497 U.S. 177, 188 (1990)) (alterations in original omitted).

[41]*Id.*

the Court is to view the facts in their totality.[42]  Here, because the Court finds that the Poghosyan had apparent authority to consent to a search, it need not determine whether he had actual authority.

In *United States v. Kimoana*[43], the Tenth Circuit addressed whether a third party had apparent authority to consent to a search of a hotel room that was registered under another's name.  There, the third party approached an officer as he was sitting in a parking lot near the hotel he was staying at.  The third party told the officer that he had stolen a vehicle and that the vehicle's key could be found in the hotel room he was sharing with his cousins, *i.e.*, people he knew from the streets.[44] After hearing the third party's admission, the officer asked him if he could go up to the room and retrieve the key.[45]  The third party said that "he didn't care."[46]  A key to the room was found on the third party's person.[47]  Based on the third party's consent, officers entered the hotel room and uncovered incriminating evidence against the defendant.[48]  The defendant challenged the officers' intrusion on, among others, the ground that the third party lacked apparent authority.  The Circuit rejected this argument.  The court stated that the officer, based on his knowledge that the third party had a key to the room and had been staying there, was justified in believing that the third party had the authority to consent to a search.[49]

This Court believes that there is a sufficient factual predicate in this case for a person of reasonable caution to believe that Defendant Poghosyan had apparent authority to consent to a

---

[42]*See Kimoana*, 383 F.3d at 1223.

[43]383 F.3d 1215.

[44]*Id.* at 1219.

[45]*Id.* at 1223.

[46]*Id.* at 1224.

[47]*Id.* at 1223.

[48]*Id.* at 1220.

[49]*Id.* at 1223.

search of room 106. Here, unlike in *Kimoana*, Poghosyan was actually present in the room at the time the officers arrived. Furthermore, he was the person who answered the door when the officers knocked.[50] Lastly, and possibly most importantly, Poghosyan told the officers that he staying in the room. Based on these facts, the Court finds that Poghosyan did not lack authority to consent to a search of room 106.[51]

In addition to showing that the consenting party had the authority to do so, the Government must also establish that the party's consent was given voluntarily and that the resulting search did not exceed the scope of that consent. The voluntariness of a party's consent "is a question of fact to be determined from all the circumstances."[52] Viewing the evidence as a whole, the Court finds that Poghosyan's consent was made voluntarily. First, there is no evidence that Poghosyan's consent was coerced.[53] Second, contrary to defendants' argument, the record does not support a finding that Poghosyan did not make his consent knowingly. As the audio recordings, Government Exhibit 14, reveal, Poghosyan had no problem understanding the other questions posed by the officers. Consequently, his consent was valid.

Additionally, the Court finds that Officer Sobolewski's search did not exceed the scope of the consent. Poghosyan clearly consented to the officers taking a quick look in the room. Arguably, this consent would justify a complete search of the room. The Court need not determine whether

---

[50]*See United States v. Rosario*, 962 F.2d 733, 737 (7th Cir. 1992) (implying that the reasonableness of an officer's belief that a third party had authority to consent to a search would be enhanced if the consent came from the person who had answered the door).

[51]Additional support for the Court's conclusion can be found in *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225. In that case, the Tenth Circuit affirmed the district court's determination that the defendant's fourteen year-old daughter had apparent authority to consent to a search of his motel room. *See id.* at 1231. The Circuit based its decision on the fact that the officers knew that the girl that consented to the search was the defendant's daughter. *Id.*

[52]*Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973).

[53]*See Kimoana*, 383 F.3d at 1225 ("Consent is voluntary if there is no indication of either 'force of intimidation.' " (quoting *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991)))

it actually did, though, because the search that Officer Sobolewski performed was quick and not extensive. There is no evidence that Officer Sobolewski search consisted of more than just looking in areas that could house additional individuals. As a result, this search was not excessive. Therefore, because Poghosyan had the authority to consent to a search of room 106, he gave his consent voluntarily and knowingly, and the resulting search did not exceed the scope of his consent, the information gained from Officer Sobolewski's search, namely the fact that an embosser machine was in the room's bathtub, could lawfully be incorporated in to Detective Magtoto's search warrant affidavit.[54]

With regards to the second search, Magtoto's, the Government concedes that it violated Poghosyan's and Mansuryan's Fourth Amendment rights. Therefore, the portions of Magtoto's affidavit reciting the observations he made during his search will be disregarded when the Court reviews the affidavit to determine whether it established probable cause to search room 106.[55] The Government concedes that the portion of the affidavit describing what Magtoto observed should be stricken and the Court should not consider it.

The third search of room 106 was made pursuant to a search warrant. Therefore, the key inquiry is whether the facts cited in Magtoto's affidavit are sufficient to establish probable cause without the stricken material. Magtoto's redacted affidavit states, among other things, the following:

---

[54]In his briefing, Defendant Baghdasaryan makes the argument that the information provided by Officer Sobolewski must be ignored because it is not credible. Baghdasaryan premises his argument on the fact that Detective Magtoto stated, in his affidavit, that he re-entered the room to corroborate Sobolewski's findings. Baghdasaryan cites no case law in support of this argument. In light of this fact, and Magtoto's testimony that he has no reason to question Sobolewski's credibility, the Court finds this argument to have no merit.

[55]See, e.g., United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996) (stating that a court should "disregard allegedly tainted material in [an] affidavit" when reviewing it to determine whether it establishes probable cause). At the hearing, the defendants also asked the Court to disregard the conclusions that the officers made from watching the motel's surveillance tapes because the officers viewed these tapes only after Magtoto illegally entered room 106. Presumably, the defendants premised this request on the belief that any evidence gathered after Magtoto's search was fruit of the poisonous tree. Because, as discussed more fully below, the Court finds that there was sufficient evidence to create probable cause before Magtoto entered room 106, the Court declines to address this issue.

(1) Officer Holmes found a reader/writer and re-encoded credit card in the trunk of the car that Mansuryan was driving; (2) Officer Holmes observed Mansuryan exit the Sakura Motel shortly before he pulled him over; (3) the manager at the Sakura Motel told responding officers that room 106 was rented to Mansuryan; (4) during a protective sweep of room 106, Officer Sobolewski noticed an embossing machine, which can be used to emboss access cards fraudulently, sitting in the bathtub; and (5) that Magtoto knows from his training and experience that suspects who acquire or possess counterfeit items keep them on their person, their vehicles, and their residence. Based on this factual recitation, the Court concludes that there was a fair probability that contraband or evidence of a crime would be found in room 106 of the Sakura Motel. As a consequence, any evidence obtained from this search should not be excluded.

### Search of Baghdasaryan's Home

The search of Baghdasaryan's home was made pursuant to a search warrant. Therefore, as long as the affidavit that was offered in support of the issuance of the warrant established probable cause, the search was constitutional. Because Baghdasaryan lacks standing to challenge the searches of the Sakura Motel, none of the information in Magtoto's affidavit needs to be excised. Nevertheless, even if the Court ignores the portion of the affidavit outlining what Detective Magtoto saw in room 106, there is enough information to establish a fair probability that contraband or evidence of a crime would be found in Baghdasaryan's home. In addition to the information discussed in the previous paragraph, the affidavit also stated the following: (1) a shipping receipt stating that a package weighing in excess of fifty-three pounds was shipped from Tampa, Florida, by Adis Poghosyan, to Vachagan Baghdasaryan's home was found on Mansuryan's person; (2) Poghosyan's description of what the package contained, clothing, contradicted what the shipping

receipt stated it contained, pharmacy equipment; (3) the motel's survelliance videos showed Mansuryan and Baghdasaryan arriving at the motel in the same car; and (4) the surveillance videos showed Baghdasaryan removing two packages from the car that he and Mansuryan had arrived in and carrying them into room 106.  Viewing this information in its totality, the Court finds that the affidavit met the requisite standard.

The case relied on by Defendant Baghdasaryan, *United States v. Rowland*[56], does not mandate a different result.  In that case, government agents targeted the defendant in a child pornography sting operation.  The agents mailed the defendant a form asking him if he was interested in receiving explicit images of young girls.  The defendant responded by stating that he was, requesting that images be mailed to him, and providing the agents with the address of his private post office box, which is where the materials were to be shipped.  Before complying with the defendant's request, the agents placed a tracking device in the box they were housed.  They also obtained an anticipatory warrant, which authorized them to search the defendant's home once the defendant brought the illegal materials inside.  However, after the defendant picked up the materials from his post office box, but before he reached his residence, the tracker stopped working.  The agents' audio and visual observations could not confirm whether the defendant had brought the contraband inside of his home.  Nevertheless, despite this uncertainty, the agents executed the warrant and uncovered the contraband.  Before trial, the defendant requested that the material be suppressed, a request the court denied.

On appeal, the defendant argued that the affidavit offered in support of the issuance of the anticipatory warrant did not establish probable cause.  More specifically, he claimed that the

_____

[56]145 F.3d 1194 (10th Cir. 1998).

affidavit did not set forth any facts that established a link between his receipt of illegal materials and their presence in his home.[57]  The Tenth Circuit agreed with the defendant.  The court recognized that one possible inference was that the defendant would take the received contraband home. However, because the defendant's home was "but one of an otherwise unlimited possible sites for viewing or storage," the court held that this inference "in and of itself, [wa]s insufficient to provide a substantial basis for concluding there was probable cause."[58]

*Rowland* is easily distinguishable from the case at hand.  According to a receipt recovered from Defendant Mansuryan's person, one of the other defendants, Poghosyan, had shipped a package to Baghdasaryan's *home*, as opposed to a post office box or some other location.  While it is true that, unlike the agents in *Rowland*, the officers in this case did not definitively know that the package shipped contained contraband, the surrounding facts are such that they raised a strong inference that it did.  For example, the shipping defendant's description of what the package contained contradicted what was written on the shipping label.  In addition, a reader/writer and re-encoded card were found in the vehicle Mansuryan was driving, an embosser was discovered in room 106's bathtub, Baghdasaryan was seen entering room 106 with Mansuryan and carrying two boxes.  Therefore, in light of these facts, the Court finds that *Rowland* does not control.  As a result, the evidence seized from the search of Baghdasaryan's home should not be suppressed.

---

[57]*Id.* at 1203.

[58]*Id.* at 1205.

**The Defendants' Motion to Suppress the Evidence From the I-70 Stops (Docs. 110, 114, 117, 121).**

The defendants do not challenge their initial stop on I-70 in Kansas.[59]  However, they do claim that their continued detention after they had denied the troopers requests to search their vehicles violated the Fourth Amendment,[60] as the troopers did not have an objectively reasonable articulable suspicion to justify the detentions and the detentions were unreasonable in duration.  The defendants also claim that PSD Justice's indications did not establish probable cause to search either the passenger compartment or the trunk of the two vehicles because PSD Justice is unreliable.

**The Continued Detainment of the Defendants Did Not Violate the Fourth Amendment**

A traffic stop may be expanded beyond its original purpose under two circumstances: the person stopped consents to the expansion or the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[61]  Here, there is no evidence that the defendants consented to their continued detention after they had denied the troopers' requests to search their vehicles.  As a result, the Government must show that the troopers had a reasonable articulable suspicion to detain the defendants.  Furthermore, it must show that the detention was limited in both scope and duration.[62]

---

[59]Even if the defendants did not concede this point, the Court would find that the troopers were justified in pulling the two vehicles over.  *See, e.g., United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993) (stating that the officer was justified in stopping the defendant because he was driving seventy-five miles per hour in a sixty-five miles per hour zone).

[60]The evidence from the suppression hearing reveals that the detainment that occurred between when the troopers issued the defendants their traffic citations and when the troopers asked to search their vehicles was consensual.  Therefore, this period of detainment did not violate the defendants' Fourth Amendment rights.  *See United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir. 1991) (stating that the continued detention of a person after the purpose behind the initial stop has been exhausted is constitutional if the person consented to the detention).

[61]*United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997).

[62]*United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004).

During the hearing, Trooper Poland stated that his decision to detain the black Mercedes' occupants for a canine sniff was independent of Trooper Harvey's decision to detain. Therefore, the Court must determine whether the facts that each trooper knew at the time they made their respective decision are sufficient to establish reasonable suspicion. As recently noted by the Tenth Circuit, when making this determination, the Court is to "accord due deference to an officer's ability to distinguish between innocent and suspicious actions," and evaluate the facts known "from the perspective of the reasonable *officer*, not the reasonable *person*.[63] The determination "does not depend upon any one factor, but on the totality of the circumstances."[64] Court are to keep in mind that "[t]he level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause."[65]

Based on the evidence presented at the hearing, the Court finds that at the time Trooper Poland decided to detain the defendants in the black Mercedes he knew the following: (1) that the black and pearl Mercedes were traveling together; (2) that the driver of the black Mercedes had driven the vehicle in a manner that Trooper Harvey interpreted to be aggressive; (3) that the driver had lied to him when he had stated that he had never been arrested; (4) that the passenger had a narcotics arrest;[66] (5) that the defendants were traveling on a known drug-courier route, I-70; (6) that the defendants in the black Mercedes did not know the person who the bachelor party was being held for nor did they know when the party was going to be held and when they were going to return back

---

[63]*United States v. Simpson*, 609 F.3d 1140, 1157 (10th Cir. 2010) (emphasis in original).

[64]*Id.* at 1146.

[65]*See United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009) (alteration in original omitted).

[66]The fact that the record reveals that Trooper Poland's belief that the passenger had an arrest for narcotics was erroneous is of no concern. What matters is what Trooper Poland reasonably believed at the time he made the decision to detain the defendants. *See Sherouse v. Ratchner*, 573 F.3d 1055, 1059 (10th Cir. 2009) (stating that a reasonable, but mistaken, understanding of the facts does not negate the legitimacy of the probable cause determination). The Court finds that Poland's belief was reasonable.

to California; and (7) the black Mercedes was a rental that was due to be returned to California in two days.

It is true, as pointed out by the defendants, that a number of these factors have little weight in the analysis. For example, the factor that the defendants were on a known drug-courier route is of little significance.[67] Furthermore, because the defendants were able to explain why they were not concerned about the fact that the vehicle was to be returned in two days (they could call and extend the lease) factor seven is also of little significance. However, the Court nevertheless concludes that the remaining factors are sufficient to establish reasonable suspicion.

The Tenth Circuit has recognized that a person's driving behavior is probative on the issue of whether an officer was justified in detaining an individual.[68] Thus, the facts that the black and pearl Mercedes were traveling in tandem at a high rate of speed and that the black Mercedes was driving in an aggressive manner is significant in the analysis. Additionally, the Tenth Circuit has stated that an individual's "criminal history *contributes powerfully to the reasonable suspicion calculus*."[69] Accordingly, the fact that the defendants had criminal records weighs in favor of finding reasonable suspicion. Also, case law in this circuit establishes that a detained person's decision to lie to an officer supports the conclusion that reasonable suspicion existed.[70] Lastly, the defendants' bizarre and vague travel plans offer some support for a finding of reasonable suspicion.[71]

---

[67] *White*, 584 F.3d at 951-52 ("Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, however, the probativeness of a particular defendant's route is minimal.").

[68] *See United States v. Lopez-Martinez*, 25 F.3d 1481, 1486 (10th Cir. 1994).

[69] *See Simpson*, 609 F.3d at 1147 (emphasis in original).

[70] *See United States v. Carhee*, 27 F.3d 1493, 1498 (10th Cir. 1994).

[71] The plans in this case are quite similar to those in *United States v. Simpson*, 609 F.3d 1140. There, the Tenth Circuit found that a driver's decision to travel a long distance to spend a single night at a friend's home and his failure to recount basic components of his travel plan, such as when he left and when he planned to return, contributed to a finding of suspiciousness. Like the defendant in *Simpson*, the defendants in this case were traveling a long distance for a single purpose, to attend a bachelor party for a person that they did not know, and were unable to recite when the party

Therefore, based on these facts as a whole, the Court finds that Trooper Poland had reasonable suspicion to detain the defendants in the black Mercedes.

Likewise, the Court also finds that Trooper Harvey had reasonable suspicion to detain the pearl-colored Mercedes' occupants. At the time he made the decision to detain, Trooper Harvey knew: (1) that the black and pearl Mercedes were traveling together; (2) that the driver of the black Mercedes had driven his vehicle in a manner that he interpreted to be aggressive; (3) the driver had a second ID; (4) the passenger would not make eye contact with him;[72] (5) the passenger had provided his information in a manner that was unusual; (6) the vehicle was a third-party rental; (7) both the passenger and driver had criminal histories; (8) the vehicle was traveling on a well known drug courier route;[73] (9) the defendants had exhibited an unusual demeanor, which Harvey described as "I'm so nervous, what are we are going to do, they got me here" behavior; and (10) the occupants had foreign names yet were attending a bachelor party for a man named John Wayne.[74]

As is clear from the above recitation, many of the factors that favored a finding that Trooper Poland had reasonable suspicion also support a finding that Trooper Harvey did as well – *e.g.*, the manner the vehicles were being driven and the vehicle's occupants had criminal histories. In addition to the similar factors, the demeanor of the occupants also supports a conclusion that reasonable suspicion existed. Based on Harvey's testimony, the level of nervousness exhibited by these defendants exceeded that of the average citizen during a routine traffic stop. As a

---

was and when they planned to come home.

[72]Defendants provided a neutral basis for this, that he had eye problems. However, this was not known to Trooper Harvey at the time, and therefore his reliance on this factor was reasonable.

[73]As noted above, this factor carries minimal weight here.

[74]Although Trooper Harvey cited this as a factor, the Court gives it *no* weight. Cross-cultural friendships are not unusual or suspicious in this country, and especially not for individuals hailing from Los Angeles.

consequence, the Court can consider it in making its determination.[75]  Viewing these facts in the cumulative, the Court concludes that Trooper Harvey had reasonable suspicion to detain the defendants in the pearl-colored Mercedes.

The Tenth Circuit's holding in *United States v. Wood*[76],does not mandate a different conclusion.  In *Wood*, the defendant was pulled over for speeding on a stretch of I-70 in Kansas.[77] During the stop, the ticketing officer noticed fast-food wrappers on the car's floor, an open map in the passenger compartment, and that the defendant was extremely nervous.  He also learned through further investigation that the defendant was returning from a trip he had taken to Sacramento, that the car the defendant was driving had been rented in Sacramento and was due to be returned the next day,[78] that the defendant was unemployed, and that the defendant had been arrested for drugs.  Based on these facts, the officer decided to detain the defendant until a canine could sniff the car.  Before trial, the defendant moved to have the evidence seized from the detainment suppressed, claiming that the officer lacked reasonable suspicion to detain him after the stop had been completed.  The district court disagreed.[79]  However, on appeal, the Tenth Circuit found that the evidence should have been excluded, stating that the facts listed above were insufficient to establish reasonable suspicion.[80]

As pointed out by the defendants, *Wood* and this case share many of the same facts. However, the Court concludes that the two cases are distinguishable on multiple grounds.  First, and most importantly, this case involves two vehicles traveling in tandem with one of them driving in

---

[75]*See United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001).

[76]106 F.3d 942 (10th Cir. 1997).

[77]*Id.* at 944.

[78]The defendant had initially told the officer that the car was rented in San Francisco.  However, he later corrected himself when the officer revealed that the rental agreement showed that the car had been rented in Sacramento. *Id.*

[79]*Id.*

[80]*Id.* at 948.

such a manner that it led a law enforcement officer to believe that the driver of that vehicle was trying to intimidate him. Second, Mansuryan lied to Trooper Poland when he denied ever having been arrested.[81] Third, the black Mercedes' defendants' travel plans were truly bizarre. Therefore, in light of these differences, the Court finds that *Wood* does not control.

In addition to their reasonable suspicion argument, the defendants argue that their detainment was unconstitutional because it was unreasonable in scope. An investigative detention may violate the Fourth Amendment when it lasts for an unreasonable amount of time.[82] "In assessing whether a detention is too long in duration to be justified as an investigative stop, [the Court must] examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."[83]

In their briefing, the defendants argued that because the narcotics detecting team did not arrive on scene until nearly an hour after they had denied the troopers' requests to search, their detainment was unconstitutional. This argument is flawed. It fails to appreciate the fact that the applicable standard is not concerned so much with time, as it is with the troopers' diligence. Here, the evidence reveals that the closest detecting team was over eighty-miles away. Despite this fact, a team was able to arrive on scene in approximately fifty minutes. The fact that the team was able to cover such a distance in the time it did shows that the troopers were acting diligently. In light of this diligence, and the fact that the duration of the detention at issue in this case is in line with the

---

[81]Mansuryan's denial is fundamentally different than the misstatement made by the defendant in *Wood*. The *Wood's* defendant's misstatement did not conceal any potentially incriminating facts. Mansuryan's misstatement, on the other hand, concealed that he had been arrested.

[82]*United States v. Sharpe*, 470 U.S. 675, 685 (1985).

[83]*Id.* at 686.

duration of detentions in other cases that circuit courts have upheld,[84] the Court rejects the argument made by the defendants in their brief.

At the conclusion of the hearing, Defendant Poghosyan's counsel raised three new arguments with regards to the issue of detention: first, that the Fourth Amendment mandates that the Kansas Highway Patrol have enough narcotic detection teams to ensure that there is no place in the state where a team is more than one hour away; second, that the Fourth Amendment requires that Trooper Harvey have called for a detection team as soon as he believed that one could be necessary, even if he had yet to be denied consent to search the vehicle; and third, that, with regards to his client, the driver of the pearl-colored Mercedes, the length of the duration was made unreasonable by Trooper Schippers participating in the search of the black Mercedes, as opposed to moving on to the pearl Mercedes immediately after PSD Justice indicated on that vehicle. Counsel failed to cite to any authority in support of any of these arguments.

With regards to the first argument, the Court finds that it has no merit. In *United States v. Maltais*[85], the Eighth Circuit rejected a similar argument. There, the court stated that a lengthy detention, which was caused because officers were waiting for a canine unit, did not violate the Fourth Amendment because the Fourth Amendment does not "require law enforcement officials, at considerable public expense, to maintain specialized personnel and equipment at remote locations at all hours of the day and night."[86] The Court agrees with this interpretation of the Fourth

---

[84]*See United States v. Donnelly*, 475 F.3d 946 (8th Cir. 2007) (60 minute detention); *United States v. Mendoza*, 468 F.3d 1256 (10th Cir. 2006) (40 minute detention); *United States v. White*, 42 F.3d 457 (8th Cir. 1994) (80 minute detention); *United States v. Frost*, 999 F.2d 737 (3d Cir.) (same), *cert. denied*, 510 U.S. 1001 (1993).

[85]403 F.3d 550 (8th Cir. 2005).

[86]*Id.* at 558; *see also United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) ("[L]ocal government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times.").

Amendment, and, thus, rejects the defendant's first argument.[87]

The Court also rejects the defendant's second argument. While the Court has not discovered any cases where a court directly addressed this argument, it has found a case where the presiding court implicitly rejected it. In *United States v. Frost*[88], two officers observed an individual they believed to be a drug courier standing in the terminal of an international airport. The officers approached the individual and asked him if he would accompany them to a nearby station. The individual agreed. While one of the officers led the individual to the station the other went to retrieve the individual's baggage. Shortly after the individual and the accompanying officer arrived at the station, the other officer also arrived with the individual's baggage in tow. About twenty minutes after the baggage arrived, the individual denied the officers' requests to search it. At that point, the officers called for a canine. The canine did not arrive for another hour.[89]

On appeal, the individual argued that the eighty minutes that elapsed between when the baggage was brought to the station and when it is was sniffed was too long, and, as a consequence, constituted an unlawful detention.[90] The Third Circuit disagreed. It stated that because the officers had immediately called for a canine at the point they were denied consent, they had acted diligently.[91] The fact that the Third Circuit choose to tether its diligency determination to the point in time that the individual denied the officers' requests, as opposed to when the officers had reason to believe that the baggage contained narcotics, which presumably would have been when the one officer went to retrieve it, is significant. It supports the notion that officers need not call for a canine

---

[87]Even if the Court were to read the Fourth Amendment as having such a requirement, that requirement would be fulfilled in this case. Trooper Schippers arrived on scene less than one hour after he was summoned.

[88]999 F.2d 737.

[89]*Id.* at 739.

[90]*Id.* at 741.

[91]*Id.* at 742.

until they have been denied consent.  The Court agrees with this line of reasoning, and without a showing of contrary authority, adopts it in this case.

As for the defendant's third argument, the Court finds that it too lacks merit.  Trooper Schippers' participation in the search of the black Mercedes added only seven minutes to the time that the defendants in the pearl Mercedes were detained.  Furthermore, and possibly more importantly, as the visual recordings from the stop of the black Mercedes reveal, Trooper Schippers' continued presence after the sniff was not unnecessary.  There were only three officers at the stop.  One was watching the defendants as they were standing in the field, while the other two, Troopers Poland and Schippers, diligently searched the vehicle.  The defendant has not pointed to one case that supports the proposition that a canine handler must leave immediately after a sniff is complete and not assist his fellow officer perform the search.  Based on this absence, and the fact that Trooper Schippers' assistance was short in duration, the Court rejects the defendant's third argument.

In sum, the Court concludes that the troopers had reasonable suspicion to detain the defendants and that the defendants' detainment was not unreasonably long.  As a consequence, the continued detention of the defendants after they denied the troopers' requests to search their vehicles did not violate the Fourth Amendment.

**PSD Justice's Indication Established Probable Cause to Search the Vehicle**

"The automobile exception [to the Fourth Amendment's warrant requirement] justifies a police search of an automobile traveling on the highway, including all containers therein, upon probable cause to believe it contains contraband."[92]  The Tenth Circuit has consistently held that probable cause can be established based on alerts by canines that are qualified, *i.e.*, canines that are

---

[92]*United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989).

trained and certified to detect narcotics.[93]  In cases involving a canine with a "poor accuracy record,"

though, an alert may not create probable cause.[94]  When a canine sniff is challenged, the Court must

make a determination as to whether the canine in question was qualified.[95]  The party "seeking to

suppress evidence bears the burden of proving the dog is unqualified."[96]

Under existing Tenth Circuit precedent, PSD Justice's indications on the two vehicles

justified the troopers' searches.  At the time of the searches, both PSD Justice and Trooper Schippers

were certified as a narcotics detection team.  Furthermore, there is no evidence that PSD Justice had

a poor accuracy record.  In fact, PSD Justice's training records reveal quite the opposite.  These

records show that PSD Justice was perfect in the controlled testing environment, which, for the

reasons stated by Lieutenant Moomau, this Court finds is the best measure of a canine's reliability.[97]

Even if the Court were to use PSD Justice's performance in the field as the measuring rod, though,

it would still find that PSD Justice was accurate.  While on the stand, Trooper Schippers stated that,

at the time of the stops, PSD Justice had performed ten to fifteen sniffs in the field.  He further added

that PSD Justice had indicated on a vehicle where neither narcotics were found nor the occupants

confessed to using narcotics in the vehicle only once.  Thus, at worst, PSD Justice's rate was ninety-

---

[93]*United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

[94]*United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997), *cert. denied*, 525 U.S. 863 (1998).

[95]*Clarkson*, 551 F.3d 1204.

[96]*Id.* at 1203.

[97]The Tenth Circuit has repeatedly noted the problem with using field results as the measure for determining
a canine's accuracy . *See Kennedy*, 131 F.3d at 1375 n.6 ("A false alert occurs when no seizable amounts of contraband
are located during a search.  However, a false alert does not mean necessarily that the dog alerted without detecting any
odor of narcotics.  Dogs are capable of detecting narcotics residue that may appear on money or clothing that has come
in contact with drugs, even though no seizable quantity has been found."); *United States v. Bertram*, 307 Fed. Appx. 214,
217 n.1 (10th Cir. 2009) ("Certainly in the instances where Taz alerted in the field, but no discernable drugs were
subsequently found by the human officers, it is possible that the dog was reacting to the scent of drugs that were no
longer present.").

percent, which far exceeds the rate required by the Tenth Circuit.[98]  Therefore, in light of these facts,

Court finds that PSD Justice was qualified, and, as a result, the troopers were justified in believing

that probable cause had been established.

Relying on two cases from this District,[99] the defendants argue that the Court must also

consider the circumstances surrounding the sniffs that took place on April 2 when determining

whether PSD Justice's indications established probable cause.  The Court is skeptical that is must

do this.[100]  However, out of an abundance of caution, it will.

The first fact that defendants cite to as proof that PSD Justice is unreliable is the fact that a

sniff that occurred nearly two days earlier did not result in an indication.  As noted by the Court

during the hearing, this fact has no bearing in this case, as the sniff was performed many hours

before the ones in question here.  The defendants next cite the facts that PSD Justice indicated on

the upwind side of the vehicles, that no narcotics were found in the black Mercedes, and that the

marijuana gleaning discovered during the inventory search was found under the front-right seat, not

the jacket in the backseat.  The Court is not moved by these facts.  First of all, the record does not

support the conclusion that PSD Justice is incapable of smelling a narcotic odor upwind on a very

---

[98]*See Kennedy*, 131 F.3d at 1378 ("We find that a 70-80% success rate meets the liberal standard for probable cause established in [*Illinois v. Gates*, 462 U.S. 213 (1983)].").  At the hearing, the defendants argued that the Court should consider the two sniffs that occurred on April 2, which they classify as false indications, when determining whether PSD Justice was reliable.  The defendants offered no support for position.  The Court is skeptical that these sniffs should be considered as false.  Moreover, even if false, they were not prior false indicators which should have made these troopers suspicious about relying on PSD Justice.  To argue that these false indicators were part of the reason the troopers should have concluded they were false is circular logic.  However, even if the Court were to take into account these sniffs, and consider them false indications, PSD Justice, at worst, would still have an accuracy rate of seventy-five percent (nine out of twelve), which still exceeds the rate set by the Tenth Circuit.

[99]*United States v. Beltran-Palafox*, 2010 WL 2287484; *United States v. Wood*, 915 F. Supp. 1126 (D. Kan. 1996), *rev'd on other grounds*, 106 F.3d 942 (10th Cir. 1997).

[100]*See Clarkson*, 551 F.3d at 1204 ("On remand, the district court should determine whether Oso was trained or otherwise reliable.  While successful *completion of a training course and a current certification would be satisfactory*, we do not exclude the possibility that reliability can established by other evidence." (emphasis added))

breezy day.[101]  Second of all, because, as pointed out by Lieutenant Moomau, a narcotic odor may be present without narcotics being physically present, the fact that no narcotics were found in the black Mercedes is of little consequence.  Third of all, it is possible that the jacket was emitting an odor stronger than the one coming from the marijuana gleaning.  Additionally, as highlighted by the Government, it is possible, because the rear windows were not rolled down, that the odor emanating from the gleaning was swirling around in the car, thus, leading PSD Justice to indicate on an item in the backseat.  Thus, these facts carry little weight with the Court.  Lastly, the defendants cite trooper conduct that they perceive to be inappropriate.  While the Court agrees that some of the responding troopers' actions were wholly inappropriate, *e.g.*, Trooper Schippers entering the black Mercedes before probable cause had been established, and an unidentified trooper stating, in effect, that hopefully the defendants would be deported, it disagrees that this conduct calls into question the legitimacy of PSD Justice's sniffs.  The only way that the Court can see that an officer's inappropriate conduct could nullify a sniff is if that officer somehow cued the canine or led the canine to indicate when it should not have.  Because, after reviewing the audio recordings multiple times, the Court does not find that Trooper Schippers engaged in such conduct, PSD Justice's sniffs are not infirm on this ground.  In sum, the Court finds that the defendants have failed to carry their burden of showing that PSD Justice was unreliable on the day of the sniffs.

As for the defendants' final argument, PSD Justice's indication on the passenger compartment did not provide probable cause to search the trunk, the Court makes short shrift of it. Recently, in *United States v. Rosborough*[102], the Tenth Circuit addressed the very same argument

[101]The Government has put forward evidence that PSD Justice was tested in windy conditions and was still accurate.  Furthermore, it has shown that PSD Justice's accuracy rate in training was one-hundred percent.  The only evidence that the defendants presented that PSD Justice could not have smelled narcotics upwind on a breezy day is Mr. Nicely.  As noted at the beginning of this Order, the Court gives no credence to what Mr. Nicely said on the stand.

[102]366 F.3d 1145.

that the defendants are making here and rejected it.[103]  Therefore, based on *Rosborough*, the Court

finds that PSD Justice's indications justified the troopers' searches of the trunks.

In conclusion, the Court finds that the evidence obtained from the I-70 stops should not be

suppressed.  As a result, the defendants' motions relating to those stops are denied.

**IT IS THEREFORE ORDERED** that Defendant Vachagan Baghdasaryan's Motion to

Suppress California Evidence (Doc. 129) is DENIED.

**IT IS SO ORDERED** that Defendant Haykaz Mansuryan's Motion to Suppress Evidence

(Doc. 110) is DENIED.

**IT IS SO ORDERED** that Defendant Artour Hakobyan's Motion to Suppress Evidence

(Doc. 114) is DENIED.

**IT IS SO ORDERED** that Defendant Adis Poghosyan's Motion to Suppress Evidence (Doc.

117) is DENIED.

**IT IS SO ORDERED** that Defendant Vachagan Baghdasaryan's Motion to Suppress

Evidence (Doc. 121) is DENIED.

**IT IS SO ORDERED** that and the Government's oral Daubert Motion is DENIED.

Dated this 28th day of October, 2010.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[103]*Id.* at 1153.